UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

| | | |
|---|---|---|
| RON BARACK and | ) | |
| DONNA MOORE BARACK, | ) | |
| | ) | |
| *Plaintiffs,* | ) | 09-cv-00565 (TLM) |
| | ) | |
| vs. | ) | |
| | ) | |
| AMERICAN HONDA MOTOR | ) | |
| COMPANY, INC., HONDA | ) | |
| MOTOR COMPANY, LTD., and | ) | |
| HONDA MANUFACTURING OF | ) | |
| ALABAMA, | ) | |
| | ) | |
| *Defendants.* | ) | September 17, 2013 |

## PLAINTIFFS' OPPOSITION TO HONDA'S MOTION
## TO PRECLUDE PHYSICIAN TESTIMONY

The Honda defendants have failed to show prejudice in allowing physician testimony concerning plaintiff Ron Barack's permanent and debilitating catastrophic injury to his left hand. Instead defendants seek to simply exclude all physician testimony that consistently shows he sustained a serious and debilitating permanent injury beyond the year of the accident in 2006 because they admit they want to deprive plaintiff from medical corroboration for his injuries.

### Honda Expert Dr. Blazar

Notably absent from defendant's supplemental briefing is their expert report from Dr. Phillip E. Blazar dated July 14, 2011. See Exhibit 1 attached. Dr. Blazar is a Boston based hand surgeon retained by Honda who rendered the attached expert report almost 6 weeks <u>after</u> Honda had been served with the June 3, 2011 Strauch summary and June 6, 2011 Weinberger summary. Defendants and Dr. Blazar had ample time to review and consider Mr. Barack's 2011 status update and before Dr. Blazar's report was rendered and two years before he was deposed in

August 21, 2013.  Indeed, given the permanent nature of the injury many years earlier, a status update was warranted.

Instead, Honda seeks unfair and inaccurate advantage to deprive any corroboration for plaintiff's injury and ignore the summary update and continuing treatment for plaintiff's permanent injury.

Given the substance of Honda's own expert Blazar's report (Exhibit 1 attached), it is surprising that Honda has continued to contend the injury was anything less than serious, permanent and ongoing.  Honda's expert contradicts counsel's own argument:

**"He clearly had a complex injury, and no reconstructive effort would have led to normal hand function. . . ."** *Id.* at p. 4.

At his August 2013 trial deposition, attached in its entirety as Exhibit 2, Dr. Blazar further opined:

Q:    And would you say or do you have an opinion as to whether nine tendons having been severed, one of which was partial and the other eight being complete, is a significant number of tendons for anyone to suffer in a hand injury?

A.    Yes, it is.

Q.    . . . would you agree with me that the surgery was about six hours?

A.    Yes.

Q.    And is that a lengthy surgery in terms of this type of injury?

A.    Absolutely.

Exhibit 2, Blazar Dep. at p. 82:3-15.

It is puzzling that defendants in desperation, claim that cross examination of their expert for failure to even conduct an IME is not fair game.  Indeed they claim they anticipated it but now believe they can take advantage and exclude it.  That Honda did not, in 2011 or anytime thereafter, seek plaintiff's IME is obvious.  Mr. Barack, according to defendant's own expert,

sustained a serious permanent debilitating injury and an IME would show the same thing that Dr.

Blazar's 'well respected' counterpart Dr. Strauch had already found in 2011.  *Id.* at p.73-74 ("I

think he was evaluated by some outstanding people and I'm comfortable making conclusions

based on their examinations").  Neither Dr. Blazar nor Honda's counsel requested an IME at

anytime.  Honda further likely waived the IME to not only avoid the obvious objective finding

that would support plaintiff and his doctors' opinions, but they did not want to pay Dr. Blazar to

travel to Connecticut to conduct and IME of plaintiff on his obvious serious injury.[1]  It is clear

that defendants had most if not all, the information they needed regarding the physical injury and

its permanency by January 2011 and the summary update in June 2011 that they object to.

Defendants paid for Dr. Blazar to render his report in mid July 2011.  They also had the

summary updates before they deposed Drs. Strauch and Weinberger on August 10 and August

25, 2011 and again for trial in August and September 2013.  Dr. Blazar admitted he also

reviewed Dr. Strauch's report rendered in 2011.  *Id.* at p. 175:3-6 and found no surprises.

Defendants entire attack relates to arguing that plaintiff did not do the things his treating

doctors recommended and that he completely stopped all treatment of any kind.  When

defendants' expert doctor was asked about Mr. Barack's physical therapy, he conceded that Mr.

Barack's intensive physical hand therapy at the Indiana Hand Center in 2006 had reached its

maximum effectiveness:

Q.      . . . what purpose, if any, would there be for continued hand therapy as Dr. Hastings
        found that without further surgery, there would be no further motion?

A.      If he felt there would be no further motion gained, then therapy to improve motion would
        not be appropriate or indicated.

Q.      Okay.  So do you have any reason to disagree with Dr. Hastings?

---

[1]  Plaintiffs did not, and still do not, object to an IME of Mr. Barack in the Bridgeport, Connecticut area.

A.      No.

Exhibit 2, Blazar Dep. at p.112:1-11.

     Dr. Blazar continued:

A.      I think it would be [described as] a severe injury, yes.

Q.      And if one could not get further motion, isn't it understandable why Mr. Barack did not continue going for further physical therapy?

A.      Yes.  I think it is understandable.

Exhibit 2, Blazar Dep. at p.113-15-20.

Q.      And that's an indication by Dr. Hastings, is it not, that there's no point in continuing therapy at that point because if he doesn't have surgery that's as good as it's going to get?

A.      So at that point that's true, yes.

Exhibit 2, Blazar Dep. at p.121:1-6.

     When asked about narcotic pain medication that Mr. Barack had been taking on and off,

Dr. Blazar again confirmed why a separate pain management expert was not needed by

defendants to provide opinions that Dr. Blazar provided regarding plaintiff's pain medication:

A.      …It's important to note that most patients even with complicated injuries most of the practitioners in my field will handle their pain management – their pain medication pain management.

Exhibit 2, Blazar Dep. at p.48:11-15

     Dr. Blazar then went on to admit:

A.      Narcotics are – chronic use of narcotics has multiple side effects and so it's typically avoided if at all possible.

Q.      So following the year 2006 or so Mr. Barack stopped taking narcotic medications. Would that be something that would be advisable pursuant to Dr. Bluestein's records and your repetition of that in your report?

A.      I think that was Dr. Bluestein's intent certainly, yes.

Q.      Do you agree with that intent?

A.    That would be my standard practice as well.

Exhibit 2, Blazar Dep. at pp 99:18-94:6.

Even Dr. Blazar's opinion about future surgeries was tempered under cross examination:

Q.    So even with the recommended surgeries or series of surgeries that we referred to before, he still would never have been able to be returned to normal hand function, is that correct?

A.    Yes.

Q.    And there was a risk that his function could have been worse after having gone through one or multiple stages of surgeries?

A.    Yes.

Q.    And to say that that's not the case would be speculation; is that right?

                        Mr. Schaffer:  Objection.

A.    Yes.

Exhibit 2, Blazar Dep. at p. 161:3-16

What defendants really want is to freeze plaintiff's injury to 2006 and have the jury not consider its permanent nature beyond this, thereby unfairly prejudicing plaintiff's case on damages.  Defendants still have the same defenses they had in 2011: that Mr. Barack did not seek additional surgeries after his initial 6 hour emergency surgery; and that he did not seek prescription pain medication after 2006 until early in 2010 when he had pain meds prescribed by Dr. Myckoff (who was properly disclosed).

Defendants are still able to argue that Mr. Barack did not seek prescription pain medication in 2007, 2008 and 2009 and therefore must have been pain free.  Plaintiff can discuss his pain condition and decisions to avoid prescription pain meds until 2010 and be cross examined.  Dr. Myckoff was also disclosed in January 2011 but plaintiffs do not intend on

calling him as a trial witness even though there is no dispute that plaintiff saw Dr. Myckoff for pain in February and March 2010 a year before he revisited Dr. Weinberger for the June 2011 update summary,[2] and resumed periodic treatment with him.

Defendants elected not to retain a pain management doctor because according to Dr. Blazar, none was needed and instead relied on Dr. Blazar to opine about pain in his report. Once again, Honda's expert Blazar admitted that Mr. Barack's injury was painful requiring prescription pain medication.

That prescription pain medication can have bad side affects is not disputed, nor is the fact that Mr. Barack stopped using them from early 2007 through the end of 2009. A pain management expert retained in 2011 by defendants or even now, would have little to say that is different from the chronology or Dr. Blazar's testimony. No pain management doctor can know what various pain levels Mr. Barack has or has not experienced since 2006. Nonetheless, defendants are free to cross examine Mr. Barack on this issue and did so with Dr. Weinberger. Defendants were fully prepared for cross examination for both of plaintiffs' treating doctors as well as their own doctor at the trial depositions in August and September 2013[3]. Dr. Weinberger's testimony that includes 2011 through 2013 visits that go to weight rather than admissibility of the evidence. Unfair prejudice has not been demonstrated by the timing of the disclosure. In short, there is no substantive unfair prejudice regarding the testimony of the two plaintiffs' doctors [Strauch -hand] and [Weinberger -pain], and one defense doctor [Blazar – hand and pain] regarding plaintiff's permanent injury. Conversely however, exclusion would result in substantial unfair prejudice to plaintiffs in limiting Doctor testimony to 2006.

---

[2] Dr. Blazar inaccurately describes the period of prescription pain medication to be absent for "almost five years" Exhibit 1, Blazar Report at p.4, when in fact the records he was given reflect that the time period was three years.
[3] Plaintiffs concede that none of the parties had notes from an office visit to Dr. Weinberger two days before his trial deposition. Counsel has been trying to obtain them, but Dr. Weinberger testified those notes only contained a prescription for pain medication similar to most of the previous visits.

## Continuing Treatment

Plaintiff's serious permanent injury occurred on March 20, 2006.  The fact that Honda's own expert has acknowledged that the injury was both serious and permanent, defines the treatment plan and prognosis after 2006.  Honda's doctor agreed at his deposition that after 2006, physical therapy would not improve Mr. Barack's hand range of motion or usefulness.  Dr. Blazar indicated that only additional painful and risky surgeries provided any hope for limited improvement on the permanent disability and periodic prescription medication would be available as needed, but discouraged.

After the first year of treating serious injuries, accident victims with serious permanent injuries routinely go for long periods of time without regular doctor treatment.  This does not mean they were "cured" as defendants wish to argue about plaintiff by the end of 2006.  Likewise, victims periodically seek follow up treatment when something new presents itself like the overuse of Mr. Barack's uninjured right hand by 2012.  Pain levels can spike at various times due to over use.  It is not unusual to occasionally seek prescription pain medication or go for long periods without them.  Further scientific advances, including new drugs, reach the marketplace frequently.  It is not unusual for someone with a permanent injury to see if there are new pain medications available that do not have the side effects that previous medications may have had. Dr. Blazar admitted that Mr. Barack's conduct was not out of the norm:

Q.    Would it be – would it surprise you that someone who suffered this injury would not from time to time go back to see a doctor to see if anything else could be done or any improvements in medicine that were made so that he might have an opportunity to gain greater use of that hand?

A.    It would be not surprising for a patient to do that.

Q.    And if I were to tell you that Mr. Barack returned to see Dr. Strauch in 2011 and again in 2012 would that be of any surprise to you?

A.      No.

Q.      Would that be something that would be expected?  Not necessarily those years, but down
        the road following surgery?

A.      It would not be unusual no.

Q.      Have you had patients who have, in fact, had similar experiences with patients of yours?
A.      Yes.

Q.      So that when you prepared your report learning or had you learned of additional visits by
        Mr. Barack to Dr. Strauch or any of his other treating physicians that would not come as
        a surprise?

A.      No, it would not come as a surprise.

Exhibit 2, Blazar Dep. p.166:7-167:8.

In short, even defendants' own expert largely agreed with plaintiffs' doctor experts

Strauch and Weinberger.  In addition, Honda's counsel cross examined Dr. Weinberger on his

pain management treatment,[4] or arguable lack thereof.  His continuing treatment goes to the

weight of the evidence, not its admissibility despite the timing of the disclosure and is routinely

admitted when there is a long gap in time between an accident and the trial.

Defendants seek to claim prejudice for continuing treatment because the additional visits

were disclosed 2 months before the scheduled trial date.  That there were no major changes in

Mr. Barack's condition or on again - off again use of prescription pain medication, and no

surprises and therefore no prejudice to defendants, is not their point, only a more timely

disclosure is their demand and exclusion their requested punishment.  But this does not equal

unfair prejudice.  Defendants seek to create new law that plaintiffs cannot introduce evidence of

continuing treatment after reports are rendered and physicians are deposed.  This however, is not

the law.  Quite the opposite.  Victims who sustain a permanent injury often continue periodic

---

[4]  As plaintiffs have admitted, plaintiffs' counsel was responsible for only the one visit in the spring of 2011 in order
to have an update and summary of Mr. Barack's condition that resulted in the June 2011 summaries by Strauch and
Weinberger.  All other visits by Mr. Barack were as a result of continuing periodic care sought by Mr. Barack.

treatment over many years, between the accident and discovery conclusion or later trial, as defendants' expert conceded.  Defendants have now had the benefit of the most up to date picture of Mr. Barack's treatment from 2006-2013.  Defendants fail to identify how they are unfairly prejudiced in advance of a May 2014 trial or even an October 2013 trial. No new theories of the damages or surprise were foisted upon defendants.  The "new" diagnosis defendants cite as described in Dr. Weinberger's June 2011 report are simply different ways to describe Mr. Barack's pain over the course of time.   Plaintiffs will continue to provide records from any additional treatment from now through trial.

### Defendants Have Misstated the Disclosure Chronology
### of Events and Judge Thompson's Prior Ruling

Defendants argue that they had no reason to accept plaintiffs' June 3 and 6, 2011 updated summaries from Doctors Strauch and Weinberger and show them to their expert Blazar, because the summaries were almost 5 months after their initial expert disclosure for these treating physicians, and because Judge Thompson had also denied leave to make additional expert disclosures.  Judge Thompson however, did not issue his first denial of plaintiffs' original motion until more than 2 weeks later on June 23, 2011 in a summary order with no written opinion. Plaintiffs moved to reconsider 5 days later on June 28, 2011.  Consequently from the June 3 and June 6 disclosures by plaintiffs, defendants had no way of knowing what the Court would say about expanding the expert discovery disclosures when defendants had also been granted an unopposed continuance to adjourn *its* expert disclosure date.  Defendants had the two reports in question and had been given more time to issue their damage expert reports.

Rather than take a practical approach and show the reports to Dr. Blazar for comment, defendants gambled judicial efficiency and ceremoniously claimed they rightly should not have consulted with their experts about the Strauch and Weinberger summary disclosures in 2011, nor

ask questions of Strauch and Weinberger about them at their August, 2011 depositions they sought to limit everything to 2006. This was a calculated gamble by defendants to manufacture prejudice.

Honda further misstates Judge Thompson's holdings. Plaintiffs original motion for leave to properly disclose damages experts and modify the scheduling order filed March 15, 2011 (docket 142) one month after appearing in the matter, centered mainly on the request to retain a psychologist, a vocational rehabilitation expert and an economist. See Exhibit 3 attached hereto. The only reference made to the January 14, 2001 disclosure of 5 treating physicians who would testify as to injury, causation and prognosis (that included Strauch & Weinberger), was that the form of the disclosure needed to be supplemented with a summary to comply with the spirit of the Federal Rules of Civil Procedure. The motion centered on retaining new, previously unidentified experts. Indeed, defendants' opposition spent 9 pages complaining about plaintiffs and prior counsel's discovery delays but did <u>not</u> complain much less discuss, the 5 doctor experts that prior counsel disclosed on January 14, 2011 or their June 2011 updated summaries. Judge Thompson's summary denial near the end of June therefore could not have addressed deficiencies in the disclosures by prior counsel and the supplemental summaries from these treating physicians from new counsel.

More importantly, when Judge Thompson finally issued a written order on the motion to reconsider the following year at the end of March, he did not exclude any of plaintiffs' experts identified by prior counsel at the end of January 2011 nor the June 2011 summary update reports, from Strauch and Weinberger. Judge Thompson's March 30, 2012 order remarked that he was not going to allow plaintiffs to start over with newly identified experts with new damage theories simply because plaintiffs obtained new counsel, even if there was no scheduled trial date.

Judge Thompson's comment that there would be no starting over "in terms of choosing a strategy and avoid the consequences of choices they made with their two prior sets of counsel". (See Docket No. 149 attached as Exhibit 4 at p. 2). This applied to the newly proposed damages' experts being sought to include a psychologist (Breed), a vocational rehabilitation expert (Blacker)[5], and an economist. None of whom had seen Mr. Barack nor been retained by plaintiffs' counsel before the spring of 2011.

Judge Thompson's statement could not have applied to Strauch and Weinberger because they had already been timely disclosed by prior counsel as experts and treating physicians. No new strategy or new damages were being undertaken when it came to these two doctors. Judge Thompson's order simply does not intend to refer to them. Indeed, the one and only case Judge Thompson referred to was *Softel, Inc. v. Dragon Med. & Scientific Communications, Inc.*, 118 F.3d 955, 961 (2d Cir. 1997) concerned a party's attempt to disclose an entirely new expert.

Strauch and Weinberger were and are treating physicians and as such, defendants have a right to periodic updates and summaries concerning their treatment of Mr. Barack which include diagnosis, prognosis and treatment that did not end in 2006, despite defendants wish to make it so. Defendants cannot on the one hand demand more timely periodic updates of their treatment of Mr. Barack through 2013 and on the other hand claim the June 2011 summaries and opinions cannot be permitted because they came almost 5 months after the timely expert disclosures in 2011. The ongoing nature of the doctor-patient relationship cannot be excluded because defendants argue it is a technical non-compliance under the original case management plan and therefore unfairly prejudicial. This argument is contradictory and inconsistent.

---

[5] As the Court may recall, defendants retained a vocational expert Jane Mattson to rebut Dora Blacker. Mattson was only recently withdrawn by defendants in August 2013.

Here there was no attempt to deceive or sandbag defendants in this discovery process. No new theory concerning Mr. Barack's serious, permanent injury has been sought or put forth regarding the treatment and opinions expressed by Strauch and Weinberger, and clearly no real prejudice occurred as even defendants own expert doctor Blazar agrees with most of what both of plaintiffs' doctors have said.

A court should only preclude testimony from experts if a party displays flagrant bad faith. *Evans v. United States*, 11-cv-1661(Ads)(GRB) 2013 WL 3967119 (EDNY 7/13/13)(treating physicians permitted to testify as experts even though they were not formally identified as such, because defendants were made aware of the identity and relevance of the doctor during the discovery process). Here, both Strauch and Weinberger treated plaintiff in 2006 before he retained counsel. Both were identified as treating physicians and experts at the appropriate time, and defendants were later provided a supplement to the original disclosure to better comply with the Federal Rules that was arguably lacking by prior counsel's disclosure, in advance of defendants' expert disclosure and before any depositions. This can hardly form the basis of prejudice two years later.

Defendants feign prejudice that is in part, of their own making. They falsely complain that they were unprepared for the trial testimony of Dr. Blazar, Strauch and Weinberger, but the questions and answers during that testimony belie defendant's overstated representations here. They should not be permitted to exclude fair testimony that is helpful to the jury and tested under cross examination of both plaintiffs' two physicians and defendants' expert physician.[6] As the Court knows, that trial testimony has already taken place and preserved on video.

---

[6] The Court need only read defendants' expert Blazar's deposition to confirm there has been no sand bagging or unfair prejudice to defendants. Nor has anything deprived them of any of their defenses. See attached Exhibit 2.

## CONCLUSION

Plaintiffs respectfully request the Court deny defendants' motion to exclude the physician testimony for the reasons stated above and to avoid a manifest injustice in plaintiffs' ability to fairly present testimony from doctors knowledgeable about Mr. Barack's injuries.

Dated: New York, New York
      September 20, 2013

                    Respectfully submitted,

                    KREINDLER & KREINDLER LLP

              By:         /s/ Andrew J. Maloney
                    Andrew J. Maloney (Bar No. CT15639)
                    750 Third Avenue
                    New York, NY 10017
                    amaloney@kreindler.com
                    (212) 687-8181

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing ***PLAINTIFFS' OPPOSITION TO HONDA'S MOTION TO PRECLUDE PHYSICIAN TESTIMONY*** was served via ECF and email this 20th day of September, 2013 upon:

> James M. Campbell, Esq.
> Michelle I. Schaffer, Esq.
> Campbell Campbell Edwards & Conroy
> One Constitution Plaza, Third Floor
> Boston, MA 02129
> (617) 241-3000
> jcampbell@campbell-trial-lawyers.com
> mschaffer@campbell-trial-lawyers.com
> *Attorneys for Defendants*


                                   /s/ Andrew J. Maloney
                                   Andrew J. Maloney